# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

ALBERTA STRONG,                    )
                                   )
            Plaintiff,             )
                                   )
      v.                           )    Case No. 12-4120-RDR
                                   )
Carolyn W. Colvin, Acting          )
Commissioner, Social Security      )
Administration,                    )
                                   )
            Defendant.             )
_____

## MEMORANDUM AND ORDER

On July 19, 2007, plaintiff filed applications for social security disability insurance benefits and supplemental security income benefits. These applications alleged a disability onset date of June 14, 2004. On February 11, 2010, a hearing was conducted upon plaintiff's applications. The administrative law judge (ALJ) considered the evidence and decided on April 30, 2010 that plaintiff was not qualified to receive benefits. Plaintiff asked for review of the ALJ's decision by the Appeals Council which was denied on August 21, 2012. Thus, the denial of benefits is the decision of defendant. This case is now before the court upon plaintiff's motion to reverse and remand the decision to deny plaintiff's applications for benefits.

I. STANDARD OF REVIEW

To qualify for disability benefits, a claimant must establish that he or she was "disabled" under the Social Security Act, 42 U.S.C. § 423(a)(1)(E), during the time when the

claimant had "insured status" under the Social Security program. See Potter v. Secretary of Health & Human Services, 905 F.2d 1346, 1347 (10th Cir. 1990); 20 C.F.R. §§ 404.130, 404.131. To be "disabled" means that the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

For supplemental security income claims, a claimant becomes eligible in the first month where he or she is both disabled and has an application on file. 20 C.F.R. §§ 416.202-03, 416.330, 416.335.

The court must affirm the ALJ's decision if it is supported by substantial evidence and if the ALJ applied the proper legal standards. Rebeck v. Barnhart, 317 F.Supp.2d 1263, 1271 (D.Kan. 2004). "Substantial evidence" is "more than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id., quoting Richardson v. Perales, 402 U.S. 389, 401 (1971). The court must examine the record as a whole, including whatever in the record fairly detracts from the weight of the defendant's decision, and on that basis decide if substantial evidence supports the defendant's decision. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994) (quoting Casias v. Secretary of Health & Human

Services, 933 F.2d 799, 800-01 (10th Cir. 1991)). The court may not reverse the defendant's choice between two reasonable but conflicting views, even if the court would have made a different choice if the matter were referred to the court de novo. Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting Zoltanski v. F.A.A., 372 F.3d 1195, 1200 (10th Cir. 2004)).

II. THE ALJ'S DECISION (Tr. 14-22).

There is a five-step evaluation process followed in these cases which is described in the ALJ's decision. (Tr. 15-16). First, it is determined whether the claimant is engaging in substantial gainful activity. Second, the ALJ decides whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments which are "severe." At step three, the ALJ decides whether the claimant's impairments or combination of impairments meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. Next, the ALJ determines the claimant's residual functional capacity and then decides whether the claimant has the residual functional capacity to perform the requirements of his or her past relevant work. Finally, at the last step of the sequential evaluation process the ALJ determines whether the claimant is able to do any other work considering his or her residual functional capacity, age, education and work experience.

In this case, the ALJ decided plaintiff's application should be denied on the basis of the fourth step of the evaluation process. The ALJ decided that plaintiff maintained the residual functional capacity to perform her past relevant work as a customer service clerk through the date of his decision.

The ALJ made the following specific findings in his decision. First, plaintiff meets the insured status requirements for Social Security benefits through June 30, 2010. Second, plaintiff did not engage in substantial gainful activity after June 14, 2004, the alleged onset date of disability. Third, plaintiff has the following severe impairments: diabetes mellitus with neuropathy; restless leg syndrome; atherosclerotic heart disease; hypertension, hyperlidemia; and chronic obstructive pulmonary disease. The ALJ further found that plaintiff has affective mood disorder, which the ALJ categorized as a non-severe impairment. In making this finding, the ALJ determined that plaintiff's mood disorder caused: a mild restriction in plaintiff's activities of daily living; no limitation in social functioning; a mild limitation in concentration, persistence or pace; and no episodes of decompensation. (Tr. 17).

Fourth, the ALJ found that plaintiff does not have an impairment or combination of impairments that meet or medically

equal the Listed Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

Fifth, the ALJ determined that plaintiff has the RFC to perform:

> a limited range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). Specifically, [plaintiff] can climb no ropes, scaffolds, or ladders; she may have only occasional handling and fingering with the left upper extremity; and she cannot have prolonged exposure to concentrated airborne pollutants.

(Tr. 18).

Sixth, in spite of these limitations, the ALJ found that plaintiff was able to perform her past relevant work as a customer clerk/service specialist. This last finding was based in part upon the testimony of a vocational expert. (Tr. 21).

III. PLAINTIFF'S ARGUMENTS

Plaintiff makes two arguments to reverse the decision to deny benefits: 1) that the ALJ failed to properly consider opinions from treating sources; and 2) that the ALJ failed to properly consider the credibility of plaintiff's testimony. In analyzing these two arguments, the court shall focus upon plaintiff's complaints of leg pain because plaintiff stated in her testimony before the ALJ that leg pain was the major reason she has not been able to work on a full-time basis. (Tr. 50). Also, plaintiff's brief in support of reversal states that her case relates primarily to her complications from diabetes, neuropathy, restless leg syndrome and left arm/hand problems.

Doc. No. 15, p. 2. Of this list, leg pain as a result of neuropathy or restless leg syndrome is the focus of plaintiff's argumentation.

IV. THE ALJ FAILED TO PROPERLY CONSIDER THE OPINION OF DR. ZULLIGER.

Plaintiff's first argument for reversal is that the ALJ failed to properly consider opinions from treating sources. Plaintiff is referring to statements from Dr. Laurel Zulliger.

A. Dr. Zulliger's opinions

Dr. Zulliger stated in 2007 that plaintiff had several chronic medical problems including: diabetes mellitus with neuropathy; atherosclerotic heart disease; restless leg syndrome; chronic obstructive pulmonary disease; depression and anxiety; hypertension; and hyperlipidemia. (Tr. 714). She commented that plaintiff "recently had an exacerbation of leg pain which I am attributing to her diabetic neuropathy and started her on gabapentin for her leg pain." Id. She concluded that "[d]ue to her multiple medical conditions I do not feel she is able to seek or maintain any employment at this time or in the future." Id. In May 2008, Dr. Zulliger stated:

> [Plaintiff] is unable to maintain any employment outside her home due to her severe chronic leg pain. I have not been able to find any medical treatment that controls her leg pain and the restless leg syndrome. She has tried multiple medications including gabapentin, Sinernet, Requip, Mirapez and Cymbalta without benefit. She is unable to work outside her home in any capacity due to the severity of her symptoms. Her pain is exacerbated by prolonged

6

sitting and ambulation. I do not feel she will be able to maintain employment in the future due to the chronic and severe nature of her symptoms.

(Tr. 776). Dr. Zulliger has also written that:

> [Plaintiff has] bilateral lower leg pain, worse since March 2007. Treated with gabapentin & Cymbalta for presumed diabetic neuropathy. (Tr. 727).

> Depression also worsened since May 2007. Patient [is] not able to maintain employment due to leg pain, fatigue and depression. (Tr. 727).

> [D]iabetes & hyperlipidemia are controlled with medication. (Tr. 728).

> [Plaintiff] is not able to stand, walk or sit for any set time period due to leg pain from diabetic neuropathy and restless legs. She also has chronic fatigue due to restless legs, leg pain and depression. (Tr. 728).[1]

## B. The ALJ's evaluation of Dr. Zulliger's opinions

The ALJ stated that he gave Dr. Zulliger's opinions "little weight because [they are] not consistent with the medical record signs, laboratory findings, and the medical record as a whole." (Tr. 21). After making this statement, the ALJ did not elaborate upon what he meant by "the medical record signs, laboratory findings, and the medical record as a whole." A few paragraphs earlier in his opinion, however, when discussing plaintiff's neuropathy and restless leg syndrome, the ALJ made

---

[1] Dr. James Fulop, who is not a treating source, has also rendered an opinion that plaintiff's condition is "incurable" and that plaintiff "is unemployable from any and all occupations." (Tr. 839). The ALJ gave Dr. Fulop's opinion "little weight" because Dr. Fulop did not have a significant treatment relationship with plaintiff and because the opinion was unsupported and apparently based on plaintiff's subjective complaints. (Tr. 21).

the following points to support his view that plaintiff's complaints were not consistent with the medical record:

> [Plaintiff] has a "mild" diagnosis of sensory neuropathy (Exhibit 3F, page 4).

> [Plaintiff] has no significant neurological deficits (Exhibits 12F, page 16, and 25F, page 6).

> She has full strength in her extremities, and her pedal pulses are intact (Exhibits 7F and 14F).

> [Plaintiff's] symptoms are not constant, and she has denied experiencing any numbness or weakness in her extremities (Exhibits 3F, page 16, and 4F, page 7).

> [I]n a recent examination, [plaintiff] reported that she was "doing pretty good" (Exhibit 9F, page 8).

> [H]er condition is listed as stable by her treating physician (Exhibit 15F, [p]age 6).

(Tr. 20). It seems logical to assume that these are the aspects of the medical record which the ALJ considered in his assessment of Dr. Zulliger's opinions regarding leg pain from neuropathy and restless leg syndrome.

C. Standards for evaluating treating source opinions

The ALJ generally will give some level of deference to medical opinions from treating sources. 20 C.F.R. § 404.1527(d)(2). The ALJ may decide to give controlling weight to a treating physician's opinion. Before doing so, the ALJ must consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and whether it is consistent with other substantial evidence in the record. Langley v. Barnhart, 373 F.3d 1116, 1119 (10th Cir.

2004).  If the treating source's opinion is not entitled to controlling weight, it may still be entitled to deference after considering:  the length of the treatment relationship and the frequency of examination; the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; the degree to which the physician's opinion is supported by relevant evidence; consistency between the opinion and the record as a whole; whether or not the physician is a specialist in the area upon which an opinion is rendered; and other factors brought to the ALJ's attention which tend to support or contradict the opinion. Id.  "'[A]n ALJ must give good reasons . . . for the weight assigned to a treating physician's opinion,' that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight.'"  Id. (quoting Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003)).  "When an ALJ rejects a treating physician's opinion, he must articulate specific, legitimate reasons for his decision."  Hamlin v. Barnhart, 365 F.3d 1208, 1215 (10th Cir. 2004).  "'In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own

credibility judgments, speculation or lay opinion.'" Robinson
v. Barnhart, 366 F.3d 1078, 1082 (10th Cir. 2004)(quoting,
McGoffin v. Barnhart, 288 F.3d 1248, 1252 (10th Cir. 2002)). A
statement that the ALJ is giving little weight to a treating
source opinion, together with "citation to contrary, well-
supported medical evidence, satisfies the requirement that the
ALJ's decision be 'sufficiently specific to make clear to any
subsequent reviewers the weight the adjudicator gave to the
treating source's medical opinion and the reasons for that
weight.'" Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir.
2007).

D. The ALJ failed to make specific citations to well-
supported medical evidence to substantiate his decision that Dr.
Zulliger's opinions are entitled to little weight.

After reviewing the record, the court does not believe the
ALJ has provided sufficiently specific citations to contrary,
well-supported evidence to support his holding that the opinion
of Dr. Zulliger is entitled to little weight.[2] First, it is
noteworthy that the diagnosis of "mild" sensory neuropathy
referred to by the ALJ was made on July 16, 2004 – more than two
years before Dr. Zulliger started seeing plaintiff.[3] There is

---

[2] To reiterate, the only specific citations to contrary authority with regard
to plaintiff's alleged neuropathy/leg pain and restless leg syndrome appear
to be made in support of the ALJ's credibility analysis. But, we assume they
are also part of the ALJ's assessment of Dr. Zulliger's opinion.
[3] This evidence may be quite relevant to plaintiff's claim for disability
benefits since plaintiff is alleging a disability onset date of June 14,
2004, but the point here is that the evidence is less powerful as a rejoinder

10

evidence in the record that plaintiff's leg pain has worsened over time. E.g., Dr. Zulliger's assessment at Tr. 727. So, the diagnosis in 2004 may not be substantially probative to plaintiff's status as described by Dr. Zulliger three or four years later.

The ALJ cites Exhibits 12F, page 16, and 25F, page 6 for his statement that plaintiff has no significant neurological deficits. Exhibit 12F, page 16 relates to an emergency room visit for chest pain on May 18, 2007. The emergency room physician noted as part of his examination that plaintiff moved all her extremities well, that plaintiff was "[n]eurovascularly intact in all four extremities," that there was no calf tenderness, and that there was "5/5 strength in all muscle groups." (Tr. 601). Exhibit 25F, page 6 (Tr. 853) is from the records of Dr. Brian Fahey. On this page of Dr. Fahey's records, he states that plaintiff has restless leg syndrome with poor control, peripheral neuropathy with some dysesthesia (an impairment of sensitivity), and left ulnar mononeuropathy across the elbow with persistent sensory symptoms. He also noted that plaintiff's exam was not all that abnormal. After a later exam on October 29, 2009, Dr. Fahey reported a myopathy (a neuromuscular disorder characterized by muscle weakness) which was identified from an EMG (electropyography). (Tr. 850). But,

---

to Dr. Zulliger's opinion because the evidence relates to a period of time before Dr. Zulliger was plaintiff's treating physician.

he was not able to prove peripheral neuropathy.  Id.  Earlier on April 30, 2009, Dr. Fahey reported peripheral neuropathy by history, but not completely confirmed by examination.  (Tr. 855).  In sum, there are portions of Exhibit 25F which, contrary to the ALJ, indicate that plaintiff has some neurological problems.  And, Exhibit 12F derives from a single emergency room visit for chest pain, not a long-term doctor-patient relationship.  Moreover, the report from the emergency room visit does not rule out muscle weakness following exertion or repetitive activity.  This possibility was noted in a statement from Dr. Leslie Friedman:

> [plaintiff] does get a lot of fatiguability and weakness with exertion which certainly would correlate with things.  Her formal testing revealed normal proximal strength but that does not eliminate the likelihood that with exertion or some repetitive activity she does have a sense of weakness.

Tr. 479 (September 22, 2004).

The ALJ cited Exhibits 7F and 14F for his statement that plaintiff has full strength in her extremities and her pedal pulses are intact.  The court has examined Exhibit 7F.  The only comment relating to having full strength in her extremities is the above-recited statement from Dr. Friedman in 2004.  This observation may be somewhat dated in reference to the 2007 and 2008 opinions of Dr. Zulliger.  Furthermore, as Dr. Friedman stated, it does not relate to weakness which may develop from exertion or repetitive activity.  The observation that

12

plaintiff's pedal pulses are intact is contained in an assessment performed by Dr. Zulliger (Exhibit 14F, Tr. 727). Obviously, this observation did not persuade Dr. Zulliger that plaintiff could stand, walk or sit for any set period of time. (Tr. 728).

The ALJ stated that plaintiff's symptoms are not constant and that she has denied experiencing any numbness or weakness in her extremities. He cites Exhibit 3F, page 16 and Exhibit 4F, page 7 for support. These exhibits contain medical records from 2004 (Exhibit 3F) and 2005 (Exhibit 4F). Once again, the situation observed by Dr. Zulliger could have been different in the years 2006-2008. Contrary to the ALJ's representation, the records in Exhibit 3F do discuss numbness in plaintiff's extremities, although the extremity is plaintiff's left hand – not one of her legs. (Tr. 418). Exhibit 4F, page 7 is from a report following an examination by Dr. Samadder as a prelude to a sleep study. On April 5, 2005, Dr. Samadder found no weakness or numbness or pain. There is no indication that Dr. Samadder had an extended doctor-patient relationship with plaintiff.

The ALJ cites Exhibit 9F, page 8 to support his statement that plaintiff reported in a "recent examination" that she was doing "pretty good." The ALJ is mistaken that this statement is from a "recent examination." The examination was conducted on August 15, 2005. The ALJ must have misread the handwritten "5"

as a "9". The year 2009 was near in time to when the ALJ conducted the hearing in this case and wrote his opinion. But, 2005 does not relate to the period when plaintiff was being seen by Dr. Zulliger.

Finally, the ALJ cites Exhibit 15F, page 6 for his statement that plaintiff's treating physician listed plaintiff's condition as "stable." Perhaps the ALJ meant to say a different exhibit number because Exhibit 15F contains records from a consultative examination report relating to plaintiff's mental health functioning. In any event, the court has not found a reference to plaintiff's condition as "stable" in our examination of Dr. Zulliger's records.[4] Nor is the court convinced that such a reference would be significant here without a better understanding of its context.

Defendant's counsel has raised grounds to limit the weight of Dr. Zulliger's opinion which were not specifically mentioned by the ALJ. Counsel notes that Dr. Zulliger did not find issues of compliance which interfered with treatment, when other treating sources noted that there were issues of compliance. Counsel also notes that there was a considerable gap in time between Dr. Zulliger's assessment and the hearing before the ALJ. Neither of these points appears to be of such significance

---

[4] If the ALJ was referring to a different treating physician, that has not been made clear in his opinion. There are references to certain conditions being stable in the records of Dr. Reddy. E.g., Tr. 826.

that the court should alter our conclusion that the ALJ did not specifically or sufficiently support his finding that Dr. Zulliger's assessment was inconsistent with the medical record signs, laboratory findings, and the medical record as a whole. Moreover, an ALJ's decision should be evaluated based solely on the reasons stated in the decision. Robinson, 366 F.3d at 1084; Knipe v. Heckler, 755 F.2d 141, 149 n.16 (10th Cir. 1985). As already stated, these points were not specifically made by the ALJ in his analysis of Dr. Zulliger's assessment.

In summary, after a careful review of the ALJ's opinion, the court is convinced that remand is necessary because the ALJ has not articulated specific, legitimate reasons for his decision to give the opinions of Dr. Zulliger little weight.

V. THE ALJ FAILED TO PROPERLY ANALYZE PLAINTIFF'S CREDIBILITY

The second major issue raised by plaintiff is whether the ALJ properly analyzed plaintiff's credibility. As mentioned above, the court believes the ALJ's credibility analysis relies upon citations to the record that do not adequately support the conclusion drawn by the ALJ. Therefore, without extending this opinion further, the court shall also remand this case for reconsideration of plaintiff's credibility.

VI. CONCLUSION

In conclusion, for the above-stated reasons the court shall remand this case for further administrative proceedings

consistent with this opinion.    This remand is ordered pursuant

to sentence four of 42 U.S.C. § 405(g).

**IT IS SO ORDERED.**

Dated this 7th day of October, 2013, at Topeka, Kansas.

s/Richard D. Rogers
United States District Judge